# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | **CRIMINAL INDICTMENT** |
| **v.** | :: | **1:10-CR-251-TWT-AJB-06** |
| | :: | **(Third Superseding)** |
| **CATARINO MORENO,** | :: | |
| | :: | |
| **Defendant.** | :: | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). The Clerk is **DIRECTED** to serve upon counsel for the parties and directly upon any unrepresented parties a copy of the R&R and a copy of this Order.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary

AO 72A
(Rev.8/8
2)

hearing for review by the District Court.  Failure to object in accordance with this rule waives a party's right to review.  FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this   8th   day of   March   , 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | :: | |
| | :: | **CRIMINAL INDICTMENT** |
| **v.** | :: | **1:10-CR-251-TWT-AJB-06** |
| | :: | **(Third Superseding)** |
| **CATARINO MORENO,** | :: | |
| | :: | |
| **Defendant.** | :: | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are Defendant Catarino Moreno's motion and amended motion to suppress evidence resulting from a May 22, 2010, stop and search of a tractor-trailer he was driving, and any subsequent statements he made. [Docs. 170, 369]. The Court held an evidentiary hearing, [Doc. 371 (hereinafter "T__")], after which the parties filed briefs, [Docs. 390 (Gov't), 396 (Moreno)].

In the government's brief, it states that Moreno no longer contests the stop and search of the tractor-trailer and the seizure of $550,822 in U.S. currency located in the tractor/cab. [Doc. 390 at 2 & n.1]. Moreno's brief does not challenge the stop of the tractor-trailer or the seizure of the money. [*See* Doc. 390]. As a result, any challenge to the stop of the vehicle and seizure of the currency is deemed abandoned. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining

that when a party fails to address a claim, the claim has been abandoned).  As a result, the Court **RECOMMENDS** that the motions challenging the stop of the tractor-trailer and the subsequent seizure of any evidence be **DENIED**.[1]  For the following reasons, the undersigned **RECOMMENDS** that the balance of the motions - - challenging whether Moreno's statements were lawfully obtained - -  be **GRANTED IN PART AND DENIED IN PART**.

### *Facts*

As of May 22, 2010, the DEA had been conducting an investigation of a Mexico-based drug-trafficking organization, from whom its seizures included over $1.5 million and 33 kilos of cocaine in January 2010.  T45-46.  As part of the investigation, the DEA had obtained Title III authorization to conduct electronic eavesdropping on telephones used by the organization.   Between May 20 and 21, 2010, intercept telephone conversations led agents to believe that Jose Trinidad Ayala-Baez, who had avoided apprehension for the drugs and currency seized in January 2010, was instructing underlings to prepare drug money for transshipment from the Atlanta area.  T50-51, 55-56.  As a result of these calls, DEA agents set up surveillance at a truck stop on I-85 in

---

[1]    However the Court will address certain aspects of the stop and seizure as they relate to whether Moreno's statements were lawfully obtained.

AO 72A
(Rev.8/8
2)

Fairburn, Georgia, where after midnight on May 22, they observed individuals (whose telephone calls were also subject to Title III interception) transferring what appeared to be duffel bags from the trunk of a white Toyota Corolla into a red tractor/cab of a tractor-trailer.  T58.  Intercepted phone calls confirmed to Ayala-Baez that the delivery of currency had been made.  T57.  The DEA agents contacted the Georgia State Patrol and advised it to try and stop the red tractor-trailer once it began traveling south on I-85.  T60.

On May 22, at about 1:30 a.m., Georgia State Patrol Trooper Craig Phillips stopped Moreno's red tractor-trailer as it was traveling southbound on Interstate 85 in Troup County, Georgia.  Phillips stopped the vehicle for following too close in violation of O.C.G.A. § 40-6-49.  T11-12.[2]  In questioning Moreno during the course of the traffic stop, Phillips concluded that his answers were suspicious, in that (1) his logbook reflected his last entry at 9:30 a.m. at Leesburg, Georgia, which was north of Albany, Georgia, and not geographically near the place of the stop nor consistent with his direction of travel; (2) Moreno claimed to have picked up his load (bottled water) in Valdosta, Georgia, which was not reflected in the logbook nor logically related to his current location (Valdosta being on I-75 and the stop being on I-85); (3) even going

---

[2]      Phillips patted Moreno down when he first exited the tractor.  T28.

3

through Atlanta as Moreno claimed in order to see his son would have taken longer than reported; (4) if Moreno was actually taking the water to Lake Charles, Louisiana, in Phillips's training and experience, a typical commercial driver would have traveled from Valdosta to Lake Charles via I-75 to I-10; and (5) Moreno's breathing was very elevated and he appeared to be very nervous during the conversation.  T13-16.

Approximately 38 minutes after the traffic stop and after Phillips gave Moreno a warning for following too close and advised him he was free to leave, Phillips requested and received Moreno's voluntary oral and written consent to search the vehicle.  T17-20, 21-22; *see also* Gov't Ex. 2 at Title 1, Ch. 1 (hereinafter DVD) at 13:49.[3]  Phillips's search of the tractor revealed in the sleeping area an opened tool kit with loose screws.  Under the mattress, he saw that some of the screws holding an aluminum shelf in place were missing and other screws appeared to have been recently disturbed or not fully tightened (and appeared to match the loose screws in the tool kit). T22-23.  He used his power drill to unscrew the compartment cover and discovered

---

[3]     The DVD did not have a time counter embedded on it, and references to the DVD in this R&R are based on the time displayed by the specific media player on the Court's computer.  However, those references might not be the same if the DVD was played on another computer.

4

numerous bundles of money contained in plastic shrinkwrap over tinfoil secreted beneath a shelf in the sleeper section of the tractor.  T24-25; Gov't Exs. 9-12.

Phillips exited the tractor with one still-wrapped bundle of the currency.  As he approached Moreno, who was standing with Trooper Moorman,[4] another trooper who had arrived on the scene, Moreno stated to Moorman, "Whoop.  He found it." Moorman asked, "Found what?," and Moreno replied, "Found the money." T26.[5]  At the time these statements were made, Moreno was standing in front of Phillips's patrol vehicle and behind his truck, in Moorman's presence, but he was not restrained or handcuffed.  Both Moorman and Phillips were in uniform and visibly armed.  T28.

Phillips told Moreno that he found "a bunch of money" in the truck and remarked that he (Moreno) did not seem surprised about it.  DVD at 30:30.  He also advised him that he was not under arrest but was under investigation until Phillips could "find out what's going on with this money."  *Id.* at 32:13.  Phillips advised Moreno of his *Miranda* rights.  *Id.* at 32:20.  After being *Mirandized* and asked whether he would

---

[4]    Although the transcript refers to the trooper as "Morman," the consent to search form presented to Moreno by Phillips, Gov't Ex. 7, spells the other trooper's name as "Moorman."  The Court will use the spelling used by Phillips.

[5]    Moorman can be heard telling Phillips about these statements at about 30:50 on the DVD.

5

answer questions, Moreno invoked his right not to answer questions.  *Id.* at 32:06-33:08; T26-28.  Phillips advised him that nonetheless he needed to investigate the money to determine whether it was from a bank robbery or whether it had been stolen. Phillips also told Moreno that he thought Moreno picked up the money in Atlanta. DVD at 33:50.  He advised Moreno that he was going to call out investigators and that Moreno had to stay there pending further investigation.  Moreno was not handcuffed. *Id.* at 32:50, 33:06.  Within two minutes, Phillips called his dispatch for investigators to come to the scene.  DVD at 35:00.

About 17 minutes after Phillips *Mirandized* Moreno, several DEA agents arrived on the scene.  T28, 65.  DEA Task Force Officer ("TFO") Kevin Cloninger first retrieved the currency and a cell phone from the tractor.  T66.  He then spoke with Moreno on the side of the road beginning at 2:15 a.m., and again when the vehicle was moved to the Troup County Sheriff's Office parking lot.  T67, 73.  Cloninger identified himself as a police officer/investigator, was dressed in plain clothes, and his firearm was hidden under his shirt.  T67.  He was assisted initially by DEA TFO Bill Manning, who spoke Spanish, until Moreno's English language proficiency was discovered.  At the side of the road, Cloninger asked Moreno about the currency and, after examining his cell phone, the missed calls displayed in the call menu.  T67-68.  Moreno stated that

6

he did not know anything about the money, who it belonged to, or where it was going, although he acknowledged he was driving to Brownsville, Texas. T68. This questioning was conducted intermittently, in that Cloninger would speak to Moreno, then conduct more investigation, and then return to speak with him again. T68.

Cloninger did not know that Moreno had been *Mirandized*, nor did he know that Moreno declined to answer Phillips's questions. T69, 75-76.[6] When Cloninger spoke with Moreno, Moreno was not handcuffed and Cloninger did not make any promises to nor threaten or coerce him. T69.

The agents wanted to move the investigation from the side of the interstate and decided to go to the Troup County Sheriff's Office, which was further down I-85. T69, 81. DEA Special Agent Keith Cromer accompanied Moreno in the tractor-trailer, which Moreno drove. T81. Cromer did not identify himself as a DEA agent, but only as a police officer. T83. Cromer's weapon was secreted beneath his shirt. T28-29. He was told by one of the other agents or the two troopers on the scene that Moreno had been *Mirandized*. T84-85, 87. He was not advised that Moreno declined to answer questions. T85, 88. During the ride, Cromer also questioned Moreno, who made admissions about the money but kept stating that this was a setup. T83.

―――――――――――――――――――

[6]     Cloninger did not ask whether Moreno had been read his rights. T78.

7

Moreno and the law-enforcement officers arrived at the sheriff's office parking lot at about 3:05 a.m.  T29.  About 15 minutes after everyone arrived at the Troup County Sheriff's Office parking lot, Cloninger again spoke to Moreno.  T70.  Manning and Cromer sometimes were present with them.  T70.  Again, Cloninger sought an explanation about the presence of the money in Moreno's truck and tried to get him to cooperate, and Moreno "made a series of small admissions to continue questioning there."  T70-71.  Moreno ultimately admitted that he had met two persons at the truck stop and received what he assumed to be currency, which he secreted in a compartment built under the bed in his truck; he was going to deliver the money in Brownsville, Texas; and he expected to be paid for his services.  T72-73.

At 4:07 a.m., Phillips turned his video camera back on as he gave a receipt to Moreno for the seized currency.  T29-30.  Moreno disclaimed any interest in the money by written waiver.  T30; Gov't Ex. 8.  Moreno was not arrested until the indictment was returned in June 2010.

### Contentions of the Parties

The government contends that all of Moreno's statements are admissible because he was never in custody, since any restrictions on his liberty were not to a degree associated with a formal arrest.  [Doc. 390 at 6, 8-9].  It additionally argues that

8

Phillips's reading Moreno his *Miranda* rights did not convert any limited detention into a full-blown arrest.  [*Id.* at 9].  Thus, the government argues, since Moreno was not in custody, he was not entitled to *Miranda*'s protections.  As a result, it contends, his *Miranda* rights could not have been violated by Cloninger and Cromer's questioning after Moreno declined to answer questions once Phillips advised him of his rights.  [*Id.* at 11].[7]

The government argues that *dicta* in *Tukes v. Dugger*, 911 F.2d 508 (11th Cir. 1990), does not compel a different result because there, as here, the defendant was not in custody when he made the statements sought to be admitted against him.  [Doc. 390 at 12].  It also argues that requiring law enforcement to obey a non-custodial suspect's invocation of the *Miranda* rights that were just read to him " 'would operate as a substantial disincentive to police to inform suspects of their constitutional protections [since i]t would convert admirable precautionary measures on the part of officers into an investigatory obstruction.' "  [*Id.* at 13 n.6 (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985))].  It then contends that if the Court disagrees, then,

---

[7]      The government acknowledges that it is no defense that the agents did not know that Moreno had invoked his right to not answer questions.  [Doc. 390 at 10 n.4 (citing *Arizona v. Roberson*, 486 U.S. 492, 494 (1988), and *Shaffer v. Clusen*, 518 F. Supp. 963, 965 (E.D. Wis. 1981)).

at a minimum, any statements made by Moreno before Phillips advised him of his *Miranda* warnings are admissible.  [*Id.*].

In response, Moreno contends that his detention on the side of the road matured into his being in custody at the time the currency was discovered.  [Doc. 395 at 6].  In this regard, he argues, referring to the factors discussed in *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004),[8] that the third and fourth factors support a custodial conclusion, since the use of a power drill to search his vehicle made the detention intrusive, and he was detained for over two hours.  [Doc. 395 at 6].  Since he was in custody, he contends his invocation of his right to remain silent should have been honored.  [*Id.* at 7].[9]

---

[8]     Those factors are " 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " *Acosta*, 363 F.3d at 1146 (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000), and *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988)).

[9]     Moreno also argues that he invoked his right to counsel, [Doc. 395 at 7], but there is no evidence of that invocation in the record.  Whether or not Moreno invoked his right to counsel in addition to his right to remain silent does not affect the conclusions the Court reaches.

10

### *Discussion*

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475. "Interrogation" under *Miranda* "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *United States v. Lopez-Garcia*, 565 F.3d 1306, 1317 (11th Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), and *United States v. Gomez*, 927 F.2d 1530, 1538 (11th Cir. 1991)). The Supreme Court has defined an "incriminating response" as "any response - - whether inculpatory or exculpatory - - that the prosecution may seek to introduce at trial." *Innis*, 446 U.S. at 302 n.5 (emphasis omitted).

On the other hand, the defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) (stating that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant

11

voluntarily waived his privilege against self-incrimination.")[10]; *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc). Spontaneous statements made before *Miranda* warnings are given are not required to be suppressed. *Miranda*, 384 U.S. at 478; *United States v. Glen-Archila*, 677 F.2d 809 (11th Cir. 1982).

*Miranda*'s procedural safeguards are required only in instances of custodial interrogation. *United States v. Moody*, 977 F.2d 1425, 1434 (11th Cir. 1992); *see also Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir. 1989) (same); *United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Since the warnings are required only in the situation of a custodial interrogation, many courts have addressed the issues of when a person is in 'custody' or has been 'interrogated' for the purposes of *Miranda*.") (quoting *Endress*, *id.*). This is because custodial circumstances are presumed to exert pressure on a suspect to speak. *See Miranda*, 384 U.S. at 444; *United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010).

In determining whether a person was in custody, the Court looks to whether the suspect was physically deprived of his freedom in any significant way or if a reasonable

---

[10]    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981.

AO 72A
(Rev.8/8
2)

person in the defendant's position would have understood that his freedom was so restrained. *Lall*, *id.* "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *United States v. Jayyousi*, 657 F.3d 1085, 1126 (11th Cir. 2011). This test "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) ("The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."). Thus, "the only relevant inquiry is how a reasonable [innocent person] in the [defendant's] position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Moya*, *id.* In determining whether the defendant was in custody, the Court must "examine all of the circumstances surrounding the interrogation," *J.D.B. v. North Carolina*, 564 U.S. ----, ----, 131 S. Ct. 2394, 2402 (citation omitted); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("No particular fact in the 'custody' analysis is outcome determinative - - we simply weigh the totality of the circumstances."). Also, the

13

relevant considerations in evaluating whether a lawful detention has become an arrest requiring probable cause (and thus triggering *Miranda*'s protections) are (1) the law enforcement purposes served by the detention, (2) the diligence with which the police pursue the investigation, (3) the scope and intrusiveness of the investigation, and (4) the duration of the detention. *Hardy*, 855 F.2d at 759. Still, officers may restrain an individual's freedom by placing him in the back of a patrol car, in handcuffs, or by pointing guns at him, but that restraint does not automatically turn a stop into an arrest. *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995); *United States v. Kapperman*, 764 F.2d 786, 790 & n. 4 (11th Cir. 1985).

However, the courts have recognized that the "line [between detention and custody] is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Hayes v. Florida*, 470 U.S. 811, 816 (1985); *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007).

Keeping in mind these standards, the Court first concludes that Moreno was not in custody and not subjected to custodial interrogation when he told Trooper Moorman, "Whoop. He found it." T26. Although the initial stop, the legitimacy of the detention,

14

and the voluntariness of consent are no longer challenged by Moreno, the Court notes that Trooper Phillips had reasonable suspicion/probable cause to stop Moreno's tractor-trailer for following too closely.  He also legitimately extended the traffic stop based on his suspicions stemming from Moreno's nervousness and responses to Phillips's questions.  Also, since there was communication between the DEA and the troopers, Phillips also had reasonable suspicion to detain Moreno and investigate whether in fact Moreno had received drug proceeds at the Fairburn truck stop.  Phillips actually had probable cause to arrest Moreno after the money secreted in the truck was located.  As a result, the Court concludes that the purpose of the detention was to further a legitimate governmental interest (the first *Hardy* factor).

The troopers also acted diligently in pursuit of their investigation up to the point of Moreno's statements to Moorman.  This second *Hardy* factor is not seriously in dispute.

Next, as to the third *Hardy* factor, the Court disagrees with Moreno that Phillips's use of a drill to find the secret compartment in the tractor was so intrusive that the lawful detention was transformed into an arrest, particularly where Moreno voluntarily consented to a search of the vehicle that permitted such an intrusion.  The written consent form expressly stated that the scope of the consent "include[d] the

15

removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purpose of concealing contraband." Gov't Ex. 7.

Finally, regarding the fourth *Hardy* factor, the duration of the stop at the time Moreno made these statements - - approximately 40 minutes after the traffic stop - - was not so lengthy so as to  transform a legitimate detention into a *de facto* arrest.  *United States v. Freeman*, 438 Fed. Appx. 864, 866 (11th Cir. Aug. 25, 2011) (45 minutes waiting for drug-detection dog did not transform traffic stop into arrest); *United States v. Ubaldo-Viezca*, 398 Fed. Appx. 573, 580-81 (11th Cir. Oct. 6, 2010) (traffic stop lasting more than one hour not transformed into arrest).  Thus, at the time Moreno made those statements to Moorman, he was not in custody.

Nor was Moreno subjected to custodial interrogation at that time, but rather he made a spontaneous statement when he saw Phillips carrying a still-unexposed bundle of currency.  "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in *Miranda*]." *United States v. Young*, 377 Fed. Appx. 965, 969 (11th Cir. May 6, 2010) (quoting *Miranda*, 384 U.S. at 478); *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) (holding that "[v]oluntary and spontaneous comments by an accused . . . are admissible

AO 72A
(Rev.8/8
2)

evidence if the comments were not made in response to government questioning")); *United States v. Savell*, 546 F.2d 43, 46 (5th Cir. 1977) (holding that *Miranda* rule "does not reach a situation . . . where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation").

Moorman's follow-up question to Moreno, "Found what?" also was not subject to *Miranda*'s protections.  He was not in custody for the same reasons discussed immediately above.  Also, the Eleventh Circuit has held in an unpublished opinion that a police officer's follow-up question to a suspect's spontaneous remark, even where the subject is in custody, does not amount to interrogation.  *United States v. Villegas-Tello*, 319 Fed. Appx. 871 (11th Cir. Mar. 19, 2009).  In *Villegas-Tello*, after the defendant was arrested, he spontaneously stated, "[T]he green's not mine.  The green's not mine." The arresting officer then asked, "Green?  What green?"  The defendant replied, "[T]he green's not mine."   The officer then asked, "The marijuana?," and the defendant responded, "[Y]es, it's not mine."   The officer then asked, "[W]hose is it?"   The defendant responded, "[I]t's the young guy, the young guy is who told me what was in it," and pointed to another arrestee.  *Id.* at 874.  The *Villegas-Tello* Court found that this colloquy did not offend *Miranda*:

While we have yet to address whether a police officer's follow-up questions, asked for the sake of clarification, to a defendant's spontaneous statements implicate *Miranda*, several of our sister circuits have held that *Miranda* also does not reach this situation.  *See United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (holding that a police officer did not initiate the conversation when the police officer picked up the spiral notebook in the course of searching the defendant's home; the defendant stated, "You can't take that"; the police officer asked why not; and the defendant responded, "I can't run my business without that," referring to his marijuana distribution activities; thus, the statement was admissible); *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997) (holding that the district court properly admitted the defendant's answers to a police officer's question when the defendant spontaneously stated, after a police officer had confiscated cocaine from his warehouse, "[W]e made you work for that shit, you all thought you weren't going to find it" and "[A]ll of that is mine"; the police officer questioned to what he was referring; and the defendant stated that he had been referring to "the coke and the gun"); *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (holding that a police officer's responsive question did not require *Miranda* warnings before its utterance when the defendant spontaneously stated upon being arrested, "I stabbed her"; the police officer asked, "Who?"; and the defendant responded, "Cathy," the name of the stabbing victim about whom the police were investigating); *Butzin v. Wood*, 886 F.2d 1016, 1017-18 (8th Cir. 1989) (holding that the defendant's confession was not the product of interrogation when he told a police officer that he had not been totally honest when making previous statements, the police officer asked what he had not been honest about, and the defendant stated that he had not accidentally bumped his wife, as previously claimed, but had pushed her into the creek because he knew she could not swim and he wanted her to die).

. . .

[The defendant's] statements did not violate *Miranda*. [The defendant's] initial statement that the "green" was not his was not the

AO 72A
(Rev.8/8
2)

product of interrogation.  *See Innis*, 446 U.S. at 301[ ].  [The officer] had not asked [the defendant] any express questions beyond those generally associated with an arrest.  *See id.*  [The officer] and the other agent involved also had done nothing functionally equivalent to express questioning.  Asking if an arrestee wished to talk and then walking with the arrestee away from the area, without holding him or otherwise forcing him to walk, does not appear to be the sort of action reasonably likely to elicit an incriminating response from the arrestee.  *See id.*  Likewise, [the defendant's] statement in response to [the officer's] questions that "green" meant marijuana and that the "young one," or [the co-defendant], had told him that the marijuana was in the U-haul was not the product of interrogation.  Neither [the officer's] question regarding what "green" meant nor his question regarding to whom the marijuana belonged appeared to be intended to elicit an incriminating response.  *See Innis*, 446 U.S. at 301[ ].  Rather, these questions appear to have been asked for the sole purpose of clarifying [the defendant's] statements.  We agree with our sister circuits on this point.  *See Rhodes*, 779 F.2d at 1032; *Gonzales*, 121 F.3d at 939; *Andersen*, 903 F.2d at 532; *Butzin*, 886 F.2d at 1017-18.

*Villegas-Tello*, 319 Fed. Appx. at 875-77.

In the present case, Moorman's follow-up question was more limited than the officer's series of questions in *Villegas-Tello*, which were found not to violate *Miranda*. Thus, Moorman's question, "Found what?," did not offend *Miranda* even if Moreno was in custody at the time.

A much closer issue is whether Cloninger's questions to Moreno on the side of I-85 violated Moreno's *Miranda* rights. The Court ultimately concludes that they did.

19

The government argues that Moreno was not in custody such that questioning Moreno after he invoked his right to remain silent does not offend *Miranda*.  Although most cases discussing *Miranda* concern whether a suspect was subjected to a restraint on freedom of movement of the degree associated with a formal arrest and was thus in custody for *Miranda* purposes, *Miranda*'s protections also are required when a reasonable innocent person in the defendant's position would have understood that his freedom was so restrained.  *Lall*, 607 F.3d at 1284; *see also Peoples v. Campbell*, 377 F.3d 1208, 1228 (11th Cir. 2004) (recognizing that two inquiries essential to determination of whether a person is "in custody" for *Miranda* purposes are (1) "the circumstances surrounding the interrogation[,]" and (2) whether a reasonable person would have felt that he was " 'at liberty to terminate the interrogation and leave' " (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995))).

The record demonstrates that a reasonable innocent person in Moreno's shoes would not have felt he was at liberty to terminate the interview and that his liberty was restrained.  First, he was read his *Miranda* rights.  The Eleventh Circuit has recognized that the reading of *Miranda* rights may be considered as some evidence by a reasonable person that he is in custody.  *Tukes v. Dugger*, 911 F.2d 508, 516 n.10 (11th Cir. 1990); *see also United States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir. 1998) ("Although

20

giving a *Miranda* warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, it is a factor to be considered by the court."); *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (holding that police officer knew that *Miranda* rights are required to be given only to individuals who are in custody, and "[a]lthough giving *Miranda* warnings to a detainee may not automatically convert a *Terry* stop into an arrest, it is evidence that the nature of the detention has grown more serious").

Second, despite Moreno's invocation of his right not to answer questions, Phillips continued to talk to Moreno about the need to continue the investigation, that he (Phillips) had been doing this a long time, and that he needed to determine whether the money was stolen or was proceeds from a bank robbery. Phillips accused him of obtaining the money in Atlanta and told him he was going to call out the investigators. He told Moreno he had to stay there until the investigation was complete. Shortly thereafter, the DEA agents arrived, and Cloninger began a "rolling" interview (T68) with Moreno by asking him questions, then doing additional investigation, and then returning to ask questions.[11] Phillips's advice of rights, followed by his statements to

---

[11]     The Court does not fault TFO Cloninger for questioning Moreno. He was not told that Moreno was *Mirandized*, nor was he told that Moreno invoked. As he testified, it was not the agents' intentions to arrest Moreno that evening, T75, and in a

Moreno that basically ignored Moreno's invocation and told him he was not free to leave, followed by Cloninger's questioning despite Moreno's invocation, would have convinced a reasonable innocent person in Moreno's situation that he was not free to terminate the interview and leave.  As a result, the questioning following the invocation is exactly what the Eleventh Circuit in *Tukes*, albeit in *dicta*, condemned:

> We feel constrained to address an argument raised by the state at oral argument regarding the result of giving *Miranda* warnings.  At the stationhouse Tukes was read a waiver of rights form, described as a "Standard Miranda Warning Form."  The state contends that because Tukes was not in custody when he was read his *Miranda* warnings, had he invoked his right to counsel the police would have been free to ignore that invocation.  The state's position is without merit.  If the state were free to tell a suspect that he had the right to an appointed lawyer, but could, while continuing to interrogate, refuse to provide the lawyer on the ground that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored.  The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police "promises" to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary.

_____

situation like Moreno's, the agents commonly do not immediately arrest currency carriers for drug organizations because they do not want to disclose the extent of the investigation to the subjects of that investigation.  T77-78.

22

*Tukes*, 911 F.2d at 516 n.11; *see also Bautista*, 145 F.3d at 1151 ("[L]aw enforcement officers are not free to give the *Miranda* warning and then blatantly ignore a suspect's attempt to invoke any right thereunder.").

Contrary to the government's argument, the Court is not making a "bad" policy choice by "punishing" law-enforcement agents who exceed their legal obligations by advising suspects of *Miranda* warnings when the subjects are not in actual custody. Nothing prevents police officers from advising suspects of *Miranda* rights when they are not in custody, but when officers do advise subjects of their *Miranda* rights, they cannot ignore the subject's invocation of those very rights. The Court fails to see how its recommendation presents a disincentive to law enforcement officers to prophylactically read *Miranda* warnings to those suspects not under formal arrest, where, as here, the fact that the suspect exercised his *Miranda* right to remain silent was not communicated to the agents called to the scene to investigate.

As a result, the undersigned concludes that because Moreno's invocation was ignored, his responses to Cloninger's questions while on the side of I-85 should be suppressed from evidence in the government's case-in-chief.

The Court also concludes that Moreno's statements to Cromer while driving the tractor-trailer to the Troup County Sheriff's Office should be suppressed from the

23

government's case-in-chief.  The Eleventh Circuit in *Virden* recognized that without a defendant's consent, causing him to move to a different location to continue an investigation constitutes an arrest that requires probable cause.  *Virden*, 488 F.3d at 1321.  The evidence demonstrates that moving from the side of the highway was for the agents' convenience.  There is no evidence that Moreno consented to the move.  As a result, even if reading Moreno *Miranda* warnings, ignoring them, and questioning him did not constitute custody for *Miranda* purposes, once Moreno was transported to the Troup County Sheriff's Office for further investigation, he was in custody and was entitled to *Miranda* warnings.  The Court recognizes that in *Virden* the defendant was handcuffed and in the rear of a patrol car when he was transported to a different location, but the Court concludes that for purposes of *Miranda*, that is a distinction without a difference.  In the present case, Moreno already had been advised that he was not free to leave pending completion of the investigation.  His invocation of his right to decline to answer questions had been ignored by further questioning, and now he was accompanied by a law-enforcement officer to another location to continue the investigation.

The Court also recognizes that the *Virden* Court criticized transporting a defendant in the absence of probable cause, and here, the agents had probable cause to

24

arrest Moreno at the latest after the currency was located and he acknowledged its presence. Whether there was probable cause or not does not affect whether Moreno was in custody for purposes of *Miranda* since it is clear that a reasonable innocent person in Moreno's situation would not feel that he could have terminated the encounter and leave.[12]

The failure to respect Moreno's invocation is more damaging when it comes to Cromer's questioning. Cromer specifically asked the troopers if Moreno had been *Mirandized* and was told that he was. T84.[13] The troopers had an obligation to pass along to Cromer that while Moreno had been *Mirandized*, he had invoked his right to decline to answer questions. As a result, Cromer's unwitting violation of Moreno's

---

[12]    It is true that Cromer advised Moreno that he was not under arrest or not getting arrested at that time, that "he was able to leave[, b]ut I appreciated him driving the tractor trailer from the stop to the Sheriff's Office because we were going to seize the tractor trailer because it carried the drug proceeds in it." T83. The Court concludes that a reasonable innocent person in Moreno's situation would have concluded that his ability to refuse to drive a law-enforcement officer and the vehicle to the sheriff's office and instead be stranded on a deserted portion of an interstate highway in the middle of the night in a state in which he did not live is a rather illusory option, particularly given Phillips's prior statement that Moreno could not leave until the investigation was over.

[13]    The Court similarly does not fault Agent Cromer. He should have been told by the troopers that Moreno invoked his right to remain silent after having been *Mirandized*.

*Miranda* invocation requires that Moreno's statements to Cromer be excluded from the government's case-in-chief.

Finally, the Court reaches the same conclusion as to Cloninger's re-questioning of Moreno in the sheriff's office parking lot.  Moreno was caused to be relocated to the sheriff's office parking lot.  His invocation of silence had been twice violated in practice by Cloninger's earlier questioning and Cromer's questioning on the way to the sheriff's office, not to mention Phillips's comments to Moreno after he invoked.  Since Moreno was in the effective legal equivalent of custody, his silence invocation was due to be respected.

### Conclusion

For all the above reasons, the undersigned **RECOMMENDS** that Moreno's motion and amended motion to suppress be **GRANTED IN PART AND DENIED IN PART**.  Specifically, the undersigned **RECOMMENDS** that the motions be **DENIED** as to the seizure of the currency and other evidence from Moreno's tractor-trailer and his spontaneous statements to Trooper Moorman, but be **GRANTED** as to his statements to DEA Task Force Office Cloninger and DEA Special Agent Cromer.

The undersigned has now ruled on all of the pretrial matters as to this Defendant.  According, the case as to this Defendant is **CERTIFIED READY FOR TRIAL**.

26

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED AND CERTIFIED** this the ____8th____ day of March, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

27

AO 72A
(Rev.8/8
2)